## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

Zabora Brown and Antraveious
Payne,

                Plaintiffs,      Case No. 1:17-cv-04850

v.                               Michael L. Brown
                               United States District Judge

City of Atlanta and Matthew
Johns,

                Defendants.

_____/

## <u>OPINION & ORDER</u>

After a highspeed car chase in September 2015, Defendant Officer Matthew Johns beat Plaintiff Antraveious Payne before arresting him, sending him to the hospital with injuries. Payne, along with his mother Plaintiff Zabora Brown, allege Defendant Johns's use of force was unconstitutionally excessive under 42 U.S.C. § 1983. They also sue Defendant City of Atlanta, seeking to impose municipal liability. All parties have filed motions for summary judgment. (Dkts. 133; 141; 148; 162.) The Court addresses each motion.

## I.   Factual Background

### A.   The Car Chase

On the afternoon of September 15, 2016, Atlanta Police Department ("APD") officers Blackman and Kennedy were on their regular patrol in downtown Atlanta when they spotted a black BMW with a stolen license plate. (Dkts. 141-1 ¶ 1; 152 ¶ 1.) The officers tried to follow the vehicle, but it sped away too quickly. (Dkts. 141-1 ¶¶ 3–4; 152 ¶¶ 3–4.) Officer Blackman used his radio to call out a description of the car and its direction of travel. Officer Pagan spotted the BMW zoom past him on Interstate 75. (Dkts. 141-1 ¶¶ 5–7; 152 ¶¶ 5–7.) He notified the radio dispatcher of the suspect's location and gave chase. (Dkts. 141-1 ¶¶ 5–7; 152 ¶¶ 5–7.) During his continued pursuit, Officer Pagan updated other officers as to his location. (Dkts. 141-1 ¶ 8; 152 ¶ 8.) APD Officers Harp and Rolfe heard the radio communications and joined the chase. (Dkts. 141-1 ¶ 9; 152 ¶ 9.)

Defendant Officer Matthew Johns, who was assigned to a specialized unit of APD known as the Atlanta Proactive Enforcement and Interdiction Unit ("APEX"), heard the radio calls about the pursuit. (Dkt. 133-1 ¶ 9.) He joined the chase when it passed his location. (Dkt. 141-1

¶ 24; 152 ¶ 24.)   In doing so, he disobeyed a direct order to all APEX officers not to get involved in the pursuit.  (Dkts. 133-1 ¶ 10; 141-1 ¶ 56.)[1] He also was not permitted to drive a police vehicle that day because he had been in a prior accident.[2]  (Dkt. 133-1 ¶ 11.)

The pursuit reached speeds of nearly 110 miles per hour, traveling on both highways and surface roads and through commercial areas and residential neighborhoods.  (Dkts. 141-1 ¶ 10; 152 ¶ 10.)  After more than ten minutes, a Georgia State Patrol Officer caught up with the pursuing APD officers.  (Dkts. 141-1 ¶ 13; 152 ¶ 13.)  The trooper stopped the BMW using a quick-action pit maneuver.  The pursuit lasted about fifteen minutes.  (Dkts. 141-1 ¶ 17; 152 ¶ 17.)

---

[1] Defendant Johns claims the only reason he joined the pursuit was because, based on the duration of the pursuit, he believed the occupants of the vehicle were armed and dangerous.  (Dkt. 133-1 ¶ 11.)  Though the subjective beliefs of Defendant Johns are immaterial at this time, the Court likewise finds no evidence that anyone else believed that those riding in the vehicle were armed and dangerous.  (*Id.* ¶¶ 12–14.)
[2] Plaintiffs also bring up Defendant Johns's prior motor vehicle accidents in 2013, 2014, and 2016.  (Dkt. 133-1 ¶¶ 35–36.)  The Court agrees with Defendant Johns, however, that these facts are immaterial to the Court's determination on summary judgment here.  (*See* Dkt. 161 at 3.)

## B.     The Immediate Aftermath

Dashcams (or what APD calls "WatchGuard") captured most of the interactions between police (including Defendant Johns) and the occupants of the car (including Plaintiff Payne) immediately following the chase.  (Dkt. 144, Ex. C.)  The Court has reviewed all available video footage.  (Dkts. 142; 144.)  Supplemented by the parties' statements of material facts, the Court summarizes those critical moments:

After the successful pit maneuver by the state trooper, APD Officers Harp, Rolfe, and Pagan drew their service weapons and approached the car.  (Dkts. 141-1 ¶ 15; 152 ¶ 15.)  APD Officers Harp and Pagan, both standing on the driver's side of the car, positioned themselves to extract and arrest the driver and any backseat passengers.  (Dkts. 141-1 ¶ 20; 152 ¶ 20.)  On the other side of the car, Officers Rolfe and Johns moved into position to grab occupants from the passenger side.  (Dkts. 141-1 ¶ 23; 152 ¶ 23.)

Three people jumped out of the BMW and immediately laid on the ground.  (Dkts. 141-1 ¶ 18; 152 ¶ 18.)[3]  Officer Harp grabbed the driver

---

[3] Likely because the driver never put the vehicle in park, the car continued to roll slowly down a slight decline (after everyone had jumped out) and stopped when it hit a tree.  (Dkts. 141-1 ¶ 19; 152 ¶ 19.)

and detained him without incident.  (Dkt. 134-24 at 73:10–15.)  Officer Rolfe grabbed the backseat passenger, detained him, and handcuffed him on the ground.  (Dkts. 141-1 ¶ 26; 152 ¶ 26.)  Payne, who had been sitting in the front passenger seat, quickly flopped out of the car and laid on his belly.  Defendant Johns exited his patrol vehicle and ran up to Payne. With forward momentum, Defendant Johns kicked Payne in the head. (Dkts. 133-1 ¶ 16; 148-1 ¶ 1; 153-1 ¶ 1.)  Johns then used his foot, lifting it vertically and stomping down on the back of Payne's head as Payne was lying face down on the ground.  (Dkt. 133-1 ¶ 18.)  Defendant Johns then knelt on Payne's back near his head and struck him in the left side of his body while trying to handcuff him.  He punched Payne again in the head with a closed left-handed fist.  (*Id.* ¶ 19.)

As Defendant Johns struggled to put Payne's left wrist in handcuffs, he punched him several more times in the abdomen.  (*Id.* ¶ 20.)  He testified that he struck him with a closed fist in the head, stomach, and ribcage because he "wouldn't give him his hands."  (Dkt. 141-1 ¶ 29.)  Defendant Johns also described his use of force as an attempt to push Payne onto the ground and gain control of his hands under his body.  (Dkt. 133-2 at 5.)  Yet a careful review of the video shows

that Payne's arms were not underneath his body when Defendant Johns first kicked him.  (Dkt. 133-2 at 6.)  The video also appears to show that, at the time of the incident, Payne was not struggling, trying to flee, or resisting arrest.  (Dkts. 148-1 ¶ 2; 153-1 ¶ 2.)  Defendant Johns's body language also suggests he was not threatened by Payne or in fear for his own safety.  The video shows him looking around at his fellow officers before he handcuffed Payne or even pulled his cuffs out.  (Dkt. 144, Ex. C at 14:14–19.)  At one point, the video appears to show Defendant Johns with his full body weight on top of the then-fifteen-year-old Payne, one knee on the back of the boy's neck and the other on the boy's lower back and side.  (*Id.* at 14:40.)

The APD officers placed the suspects under arrest as other officers arrived on the scene.  (Dkts. 141-1 ¶ 31; 152 ¶ 31.)  Within a minute of the stop, Senior Patrol Officer Amy Soeldner arrived and saw blood on Payne's mouth and near one of his ears.  (Dkts. 141-1 ¶ 32; 152 ¶ 32.)  She called for an ambulance to take Payne to Grady Hospital for evaluation and treatment.  (Dkts. 141-1 ¶ 33; 152 ¶ 33.)

In total, Defendant Johns kicked and punched Payne in the head, neck, and torso for a period of around thirty-six seconds.  (Dkt. 133-1

¶ 69.)  He had his knee on Payne's neck for even longer.  (Dkt. 144, Ex. C at 14:07–15:00.)  Payne received injuries and abrasions to his head and face and suffered a concussion requiring an overnight hospital stay. (Dkts. 133-1 ¶ 71; 141-1 ¶ 1; 152 ¶ 1.)

### C.   APD's Disciplinary Response to the Incident

APD maintains a policy that prohibits employees from the unnecessary or unreasonable use of force against any person or property. (Dkts. 141-1 ¶ 41; 152 ¶ 41; 153-1 ¶ 40.)   After the incident, the department's Office of Professional Standards ("OPS") opened an investigation. (Dkts. 133-1 ¶ 2; 148-1 ¶¶ 9, 37; 153-1 ¶¶ 9, 37.)  Sergeant Peter Malecki determined Payne had not struggled with Defendant Johns, resisted arrest, or disregarded orders.  (Dkt. 133-1 ¶ 24.)  OPS thus found Defendant Johns's use of force against Payne was unreasonable, unnecessary, and unauthorized.  (Dkts. 141-1 ¶ 57; 152 ¶ 57; 148-1 ¶ 33; 153-1 ¶ 33.)   APD terminated Defendant Johns's employment and dismissed him from the force.  (Dkts. 133-1 ¶ 3; 141-1 ¶ 59; 152 ¶ 59; 153-1 ¶ 41.)

### D.   The Criminal Proceedings Against Defendant Johns

A Fulton County grand jury eventually returned an indictment against Defendant Johns, charging him with four counts of aggravated assault, two counts of making false statements and writings, and two counts of violating his oath of office. (Dkts. 133-1 ¶¶ 4, 25; 148-1 ¶ 5; 153-1 ¶ 5.) Three of the assault charges stemmed from Defendant Johns kicking Payne with his foot. The fourth involved him kneeling on Payne's neck and throat and applying pressure to impede Payne's normal breathing. (Dkt. 133-1 ¶¶ 26–29.) The false statement counts charged Defendant Johns with knowingly and willfully making false statements during the investigation by stating to his supervisor that Payne received his injuries from jumping out of a moving vehicle (and that he did not use force against Payne) and by writing in an APD report that Payne tried to stand up causing Defendant Johns to push Payne to the ground with his leg. (Dkt. 133-1 ¶¶ 30, 31.)

Defendant Johns pleaded guilty to all counts in the indictment. (Dkts. 141-1 ¶ 60; 152 ¶ 60.) During his plea colloquy, he acknowledged under oath that he understood the charges against him and understood his right to plead guilty or not guilty. (Dkt. 133-1 ¶ 38–39.) He also

acknowledged that his plea was voluntary and that he was pleading guilty because he was in fact guilty. (*Id.* ¶¶ 40–41.) After accepting the guilty plea, Fulton County Superior Court Judge Constance Russell sentenced Defendant Johns to twenty years in prison, to serve five years. (Dkts. 133-1 ¶¶ 5–6; 148-1 ¶ 6; 153-1 ¶ 6.)[4]

In this civil trial, however, Defendant Johns contends that, although he pleaded guilty in his criminal proceedings, he is not guilty of any count within the indictment. (Dkt. 133-1 ¶ 42.) He instead claims that he pleaded guilty only because his "lawyer at the time quit the day of the trial" and "we only had 30 days to prepare for trial." (*Id.* ¶ 43.) Defendant Johns claims he did not commit the acts attributed to him. (*Id.* ¶ 7.)

## E.    Defendant Johns's Background

Before becoming a police officer in 2010, Defendant Johns was a member of the United States Marine Corps, serving four years and completing two deployments in Iraq. (Dkts. 148-1 ¶¶ 7, 9; 153-1 ¶¶ 7, 9.)

---

[4] Plaintiffs include statements of the sentencing judge in their statement of material facts. (Dkt. 133-1 ¶¶ 51–56.) Defendant Johns focuses on how Judge Russell was not qualified as a testifying expert. (Dkt. 161 at 4.) The Court, however, finds those statements immaterial to the Court's determination at summary judgment.

He was involved in multiple Improvised Explosive Device (IED) attacks, with two directly hitting his vehicle. (Dkt. 148-1 ¶ 10.) Defendant Johns was discharged in January 2009. (Dkts. 148-1 ¶ 7; 153-1 ¶ 7.) During a Veterans Administration evaluation ten months later, Johns reported exposure to traumatic events from combat that included casualties of civilians, fellow soldiers, and enemies. (Dkt. 148-1 ¶ 11.) He reported feeling vigilant and having feelings of irritability, a shortened temper, difficulty sleeping, difficulty concentrating, forgetfulness, and depression. (*Id.* ¶ 12.)

Defendant Johns testified that his PTSD began with his first deployment to Iraq. (*Id.* ¶ 29; Dkt. 153-1 ¶ 29.) He said he was suffering from PTSD when APD hired him in 2010. (*Id.*) He also testified that — throughout his time with APD — he experienced nightmares and panic attacks and was constantly on alert and jittery. (Dkts. 148-1 ¶ 30; 153-1 ¶ 30.)

## F.   Defendant City of Atlanta's Psychological Screening Procedures for New Hires

APD requires all new recruits to undergo a psychological screening to identify anyone with serious disorders of thought, mood, personality, or impulse control. (Dkts. 148-1 ¶ 13; 153-1 ¶ 13.) The screening is

intended to ensure that an applicant is neither seriously exploitative, manipulative, nor hostile, and is adequately able to relate to citizens and peers.  (Dkts. 148-1 ¶ 14; 153-1 ¶ 14.)   All APD applicants must also submit to a pre-employment psychological interview conducted by a licensed psychologist.  (Dkts. 148-1 ¶ 15; 153-1 ¶ 15.)

Plaintiffs claim Defendant City of Atlanta failed to conduct the necessary investigation into Defendant Johns's psychological background.  (Dkt. 148-1 ¶ 16.)  The City says its psychologist, Dr. Joseph Hill, conducted the required psychological screening and determined Defendant Johns could work as a police officer.  (Dkt. 153-1 ¶¶ 16–17.)  It says Dr. Hill concluded Defendant Johns exhibited no gross psychopathology, cognitive deficits, or personality factors that would interfere with his ability to be an APD officer.  (Dkts. 148-1 ¶ 18; 153-1 ¶ 18.)  Defendant Johns had told Dr. Hill he was a combat veteran.  But Dr. Hill did not investigate further to learn how much that combat experience may have affected Defendant Johns's fitness to be a police officer.  (Dkts. 148-1 ¶ 19; 153-1 ¶ 19.)

Despite acknowledging that military and combat experience may impact a person's psychological fitness, Dr. Hill does not typically review

a combat veteran's military records during psychological screenings. (Dkts. 148-1 ¶ 20; 153-1 ¶ 20.)  He claims, however, that Defendant Johns did not exhibit any signs of PTSD at his initial applicant screening in October 2009.  (Dkts. 148-1 ¶ 22; 153-1 ¶ 22.)

Plaintiffs criticize Dr. Hill's evaluation of Defendant Johns, arguing he included no test for PTSD.  (Dkt. 148-1 ¶ 23.)  The City counters that Dr. Hill asked whether Defendant Johns experienced any symptoms commonly associated with PTSD, and Defendant Johns specifically denied all such symptoms.  (Dkt. 153-1 ¶ 23.)  Dr. Hill admits, however, that Defendant Johns is not currently fit to serve as a police officer because he suffers from complex PTSD.  (Dkts. 148-1 ¶ 24; 153-1 ¶ 24.)

During the criminal proceedings, Dr. David Anthony conducted another psychological evaluation of Defendant Johns.  He testified that Defendant Johns's PTSD might or might not have played a role in Defendant Johns's actions on the date of the incident.  (Dkt. 153-1 ¶ 25.) Dr. Anthony also concluded that Defendant Johns should not be a police officer because "nobody that has PTSD untreated should be a police officer or have a firearm."  (Dkts. 148-1 ¶ 27; 153-1 ¶ 27.)

### G.   Testimony of Expert Dr. William Gaut, PhD

Dr. William Gaut offered expert testimony about APD's training techniques.   He testified that "APD regularly teaches officers to use the very physical techniques for which Officer Johns [was] criminally charged."  (Dkt. 148-1 ¶ 66.)   He also identified an APD PowerPoint presentation on the use of force, which (he says) is used to teach APD officers to "hit them back first."  (*Id.* ¶ 67.)  The City does not deny the substance of this fact but contends officers are trained to use such techniques only against *resisting* suspects.

Dr. Gaut also testified APD officers learn to use closed fist punches to muscular target areas of a resisting offender.  (*Id.* ¶¶ 70–72; Dkt. 153-1 ¶¶ 70–72.)   Areas such as the rib cage and brachial junctions are particularly sensitive to pain without causing serious injury.  (Dkts. 148-1 ¶¶ 70–72; 153-1 ¶¶ 70–72.)   Together with self-defense, using closed fist punches are taught as "pain compliance" techniques to "encourage the offender to surrender."  (Dkts. 148-1 ¶¶ 70–72; 153-1 ¶¶ 70–72.)  So, in this instance, as Payne's head and upper body again began to rise — an indication of resistance — the video shows Defendant Johns using a punch to the back of his head.  (Dkts. 148-1 ¶ 73; 153-1 ¶ 73.)

Dr. Gaut identified and analyzed dozens of APD Use of Force reports in which supervisors determined officers' use of closed-fist strikes and other techniques were "reasonable force" and "justified and in compliance with APD policies and Georgia code." (Dkts. 148-1 ¶ 74; 153-1 ¶ 74.)  Again, the City does not deny this fact but clarifies that the officers' actions were found reasonable and justified *because they were used against resisting suspects*.  (Dkt. 153-1 ¶¶ 74–75.)

Plaintiffs contend APD allows officers to use compliance strikes to include kicking and punching suspects, even when a subject is not resisting.  (Dkt. 148-1 ¶ 77.)  Dr. Gaut also testified that Defendant Johns's actions against Payne are "reflective of what other officers did in the same or similar circumstances as to what Officer Johns did and they were all found to be justifiable and in compliance with APD policies." (*Id.* ¶ 79.)  But the City counters that Dr. Gaut failed to identify a single use of force report that allowed officers to use compliance strikes when a subject was not resisting or flouting an officer's commands.  (Dkt. 153-1 ¶ 77.)  The crux of the issue, then, is whether the suspect is resisting or refusing to obey an officer's commands.  For purposes of municipal

liability, all parties agree that if Payne was not resisting, Defendant Johns's use of force would not be proper or reasonable.

## H.   Performance Reviews of Defendant Officer Johns and Early Warning System

Plaintiffs contend that Defendant Johns received midyear and annual performance evaluations from his hiring in 2009 through 2012. But no record exists of his annual performance evaluation from 2014 through his termination in 2017.  The City also kept no record of any midyear performance evaluations from 2013 through his termination, even though its policies required it to maintain the records.

APD also employs an "Early Warning System" that allows it to identify employees with patterns of misbehavior.  (Dkts. 148-1 ¶ 88; 153-1 ¶ 88.)  Based on other use of force incidents in April 2015, March 2015, October 2013, and September 2014, Defendant Johns met the Early Warning System criteria and should have been flagged.  (Dkts. 148-1 ¶ 91; 153-1 ¶ 91.)  But OPS failed to launch the Early Warning Review process for Defendant Johns as required by APD policy.  (Dkts. 148-1 ¶ 92; 153-1 ¶ 92.)

The City contends that OPS relied on another database (IAPro) to provide alerts, and it never notified OPS of Defendant Johns's status.

(Dkt. 153-1 ¶ 92.)   The City, however, does not contest the underlying fact: Defendant Johns should have been flagged by the Early Warning Review system but somehow slipped through the cracks and never was. (Dkts. 148-1 ¶ 99; 153-1 ¶ 99.)

## I.     Procedural History

In November 2017, Plaintiffs sued Defendants Johns and the City of Atlanta, seeking compensatory damages for violating Plaintiff Payne's constitutional and statutory rights.  (Dkt. 1.)

This case has had a long and convoluted procedural history in the interim, however.   The City of Atlanta did not provide counsel to Defendant Johns.  Because of a mistaken entrance of appearance on his behalf, he never answered the complaint.   (Dkts. 12 at 1; 94 at 10.) Plaintiffs sought a default judgment against him.  (Dkt. 56.)  The Court granted Defendant Johns *in forma pauperis* status and appointed him counsel.  (Dkts. 77; 78.)  That lawyer successfully argued against default judgment.  The parties then agreed to stay this case pending resolution of Defendant Johns's criminal charges in Fulton County Superior Court. (Dkts. 91; 93; 94.)

Following his guilty plea and sentencing, this matter resumed. (Dkts. 99; 100.)  And after the close of discovery, the parties filed their motions for summary judgment.  (Dkts. 133; 141; 148; 162.)  The Court considers each of those pending motions, plus two motions to strike. (Dkts. 166; 170.)

The Court notes that, in responding to Plaintiffs' motion or in support of his own, Defendant Johns largely disregarded Local Rule 56.1B, which requires a nonmovant to refute directly each of a movant's facts with concise responses and specific citations to evidence.  LR 56.1B(2)(a)(2), NDGa.  For the most part, Defendant Johns simply denies Plaintiffs' claims of undisputed facts, stating that "the underlying opinions and assumptions are not correct."  (*See, e.g.*, Dkt. 161 at 1.)  He also failed to file his own statement of material facts about which he believes genuine issues exist.  *See* LR 56.1B(2)(b) (requiring the nonmovant to file a "statement of additional facts which the respondent contends are material and present a genuine issue for trial").

Because Defendant Johns violated Local Rule 56.1B, the Court considers admitted each of Plaintiffs' facts to which he failed to respond properly.  *See* LR 56.1B(2) ("This Court will deem each of the movant's

facts as admitted unless the respondent . . . directly refutes the movant's fact with concise responses supported by specific citations to evidence . . . ."); *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1303 (11th Cir. 2009) ("Plaintiffs['] failure to comply with local rule 56.1 is not a mere technicality."); *see also Smith v. Mercer*, 572 F. App'x 676, 678 (11th Cir. 2014) (noting that district court properly found defendants' facts admitted under Local Rule 56.1 where plaintiff responded to facts without including citations to evidence of record). The Court notes, however, that many of Plaintiffs' facts also contain inappropriate argumentative assertions and legal conclusions. (*See, e.g.*, Dkts. 133-1 ¶ 17; 148-1 ¶¶ 96–97.) The Court disregards any such facts that do not conform to the Local Rules. *See* LR 56.1B, NDGa.

This determination, however, does not discharge Plaintiffs' burden at summary judgment. The Court must still review the evidence to determine whether, based on the undisputed facts, they are entitled to judgment as a matter of law. *Mann*, 588 F.3d at 1303 (citing *Reese v. Herbert*, 527 F.3d 1253, 1269 (11th Cir. 2008)).

## II.    Legal Standard

### A.    Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material if "it might affect the outcome of the suit under the governing law." *W. Grp. Nurseries, Inc. v. Ergas*, 167 F.3d 1354, 1360 (11th Cir. 1999). A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* at 1361.

The party moving for summary judgment bears the initial burden of showing a court, by reference to materials in the record, that there is no genuine dispute as to any material fact. *Hickson Corp. v. N. Crossarm Co.*, 357 F.3d 1256, 1260 (11th Cir. 2004). A moving party meets this burden by "showing—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). The movant, however, need not negate the other party's case. *Id.* at 323.

Once the movant has adequately supported its motion, the nonmoving party then has the burden of showing that summary judgment is improper by coming forward with "specific facts" showing a genuine dispute. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Ultimately, there is no "genuine issue for trial" when "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Id.* "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48.

Throughout its analysis, a court must "resolve all reasonable doubts about the facts in favor of the non-movant, and draw all justifiable inferences in his or her favor." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993). "It is not the court's role to weigh conflicting evidence or to make credibility determinations; the non-movant's evidence is to be accepted for purposes of summary judgment." *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996).

## B.    Motion to Strike or Exclude

Trial courts serve a critical gate-keeping function for the admissibility of expert testimony. *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589 (1993). Expert testimony can be particularly persuasive, and as such, the role of the trial court is to keep speculative and unreliable testimony from reaching the jury. *Id.* at 595; *see McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002).

Federal Rule of Evidence 702 allows a qualified expert to give opinion testimony when it is necessary to help the trier of fact understand the issues, the opinion reflects enough facts or data, the expert produced it using reliable principles and methods, and those principles and methods were reliably applied to the facts of the case. Fed. R. Evid. 702. The Eleventh Circuit employs a "rigorous" three-part inquiry to determine whether an expert's testimony meets these admissibility criteria. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998). Expert testimony is admissible when

> (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and

(3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

*Id.* (internal footnote omitted).  Thus, the admissibility of an expert's opinion turns on three things:  qualifications, reliability, and helpfulness. *See United States v. Frazier*, 387 F.3d 1244, 1260–62 (11th Cir. 2004).

While the trial court's role is critical, it "is not intended to supplant the adversary system or the role of the jury."  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1311 (11th Cir. 1999).  When the accuracy of evidence is the issue — rather than its admissibility — the trial court should allow the judicial process to resolve the matter.  *Daubert*, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

## C.   Qualified Immunity Standard

"Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002) (internal quotation marks omitted).  So "[q]ualified

immunity gives government officials breathing room to make reasonable but mistaken judgments about open legal questions." *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011).   It allows officials to "carry out their discretionary duties without the fear of personal liability or harassing litigation." *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002).   When properly applied, qualified immunity thus "protects all but the plainly incompetent or those who knowingly violate the law." *al-Kidd*, 563 U.S. at 743 (internal quotation marks omitted).

Qualified immunity may attach only when the officer is "acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Grider v. City of Auburn*, 618 F.3d 1240, 1254 n.19 (11th Cir. 2010).   The parties agree Defendant Johns acted within the scope of his discretionary authority at the time of the incident.   (Dkts. 133-1 ¶ 1; 161 at 1.)   In a motion for summary judgment seeking the application of qualified immunity, Plaintiffs thus have the burden of showing that it is unavailable to Defendants.   *See Lee*, 284 F.3d at 1194.

The qualified immunity analysis presents two questions:   first, whether the allegations establish the violation of a constitutional right; and second, if so, whether the constitutional right was clearly established

when the violation occurred. *Hadley v. Gutierrez,* 526 F.3d 1324, 1329 (11th Cir. 2008). These distinct questions "do not have to be analyzed sequentially." *Fils v. City of Aventura*, 647 F.3d 1272, 1287 (11th Cir. 2011). Instead, a court may address them in either order, although a plaintiff's failure on either prong dooms his claim. *Id.*

On summary judgment, the burden thus lies with Plaintiffs to show that genuine disputes of material fact exist that Defendants' actions violated the relevant constitutional rights and that the rights were clearly established at the time of the arrest. *See Hadley*, 526 F.3d at 1329.

## III. Discussion & Analysis

### A. Motions to Strike

Defendant Johns has moved to exclude the expert opinions of Sergeant Scott DeFoe and also any references to "concussion" in Payne's medical records. (Dkts. 166; 170.) Plaintiffs oppose both motions. (Dkts. 169; 172.)

#### 1. Motion to Exclude Opinions of Sergeant DeFoe (Dkt. 166)

In support of his motion to exclude the testimony of Sergeant Scott DeFoe, Defendant Johns argues that the opinions are not relevant to

matters at issue in the case and do not derive from reliable principles and so must be excluded.  (Dkt. 166 at 5.)

In opposition, Plaintiffs assert that Mr. DeFoe, as a retired police officer and law enforcement expert, is qualified to provide expert testimony in this case.  (Dkt. 169 at 13.)  They also argue that his opinions about professional and ethical standards of law enforcement are relevant and admissible as helpful to the jury.  (*Id.*)  The Court agrees with Plaintiffs that Sergeant DeFoe's testimony is not subject to exclusion. This is because he is qualified to testify, his testimony would be helpful to the jury, and his opinions follow reliable principles.  And Defendant Johns has simply not shown otherwise.  The Court thus denies Defendant Johns's motion to exclude the expert testimony of Sergeant Scott DeFoe. (Dkt. 166.)

### 2. Motion to Strike References to "Concussion" (Dkt. 170)

Defendant Johns next moves to exclude any reference to "concussion" in Payne's medical records as unreliable under *Daubert*. (Dkt. 170.)  He argues that the diagnostic opinions are inadmissible under Rule 803(4), the injuries are not attributed to Defendant Johns,

and no scientific basis exists to conclude Payne had a concussion.  (Dkt. 170 at 1.)

Plaintiffs respond that Payne's medical records are admissible as certified business records.  (Dkt. 172 at 2.)  They also contend that Defendant Johns had a chance to depose Plaintiffs or any of the treating hospital personnel but chose not to do so.  (*Id.*)  Finally, Plaintiffs argue that although there is no legal basis to exclude the records, the weight and credibility of those records would ultimately be an issue for the jury to decide.  (*Id.* at 3.)  The Court agrees with Plaintiffs and denies Defendant Johns's motion for each reason explained in Plaintiffs' response.

The medical records are relevant, as they prove the extent and severity of his injuries.  Defendant Johns's own expert relied on them, along with APD in his investigation and the Fulton County prosecutors in the criminal proceedings.  Finally, the treating physicians offered observations based on their personal knowledge and do not provide causation opinions or hypotheses about what caused Payne's injuries. The Court thus denies Defendant Johns's motion to exclude.  (Dkt. 170.)

**B.     Motions for Summary Judgment**

The parties have all cross-moved for summary judgment.  (Dkts. 133; 141; 148; 162.)  The City moves for summary judgment on all claims against it.  (Dkt. 141.)  In response, Plaintiffs request partial summary judgment against the City.   (Dkt. 148.)   They have also moved for summary judgment against Defendant Johns, to which he has responded with his own motion.  (Dkts. 133; 162.)

### 1.     Motions for Summary Judgment on Plaintiffs' Claims Against Defendant Johns (Dkts. 162; 133)

In his motion, Defendant Johns argues he is entitled to summary judgment because "the video of the encounter shows that Officer Johns did not hit Thief Payne[5] as alleged" and because "Payne did not suffer more than de minimis injury, and that such an injury is not a basis for recovery under 42 U.S.C. § 1983."  (Dkt. 162 at 1.)   The Court finds Defendant Johns's motion problematic for several reasons.  First, and fundamentally, he fails to show the lack of a genuine dispute of material fact that would entitle him to judgment as a matter of law.  If anything,

---

[5] The Court does not condone Defendant Johns's use of the title "Thief" in reference to Mr. Payne.  The Court is well aware that Payne was riding in a stolen car before the events at issue in this case.  Payne nevertheless deserves to be treated with respect in these proceedings.

Defendant Johns's arguments highlight a serious dispute about the events that took place and the extent of the injuries Payne sustained. He also fails to include a statement of material facts that he contends are undisputed and entitle him to summary judgment. The Court thus has only Plaintiffs' statement of facts to consider.

Further, Defendant Johns argues that "he did not do the acts attributed to him" and "there was no injury to plaintiff caused by him." (Dkt. 162 at 13.) As Plaintiffs correctly note, however, Defendant Johns already admitted assaulting Payne when he pleaded guilty to the criminal indictment. In his civil deposition, Defendant Johns argues that although he pleaded guilty, he is not actually guilty of any of the acts attributed to him. But Defendant has provided no basis on which the Court could grant him summary judgment on Plaintiffs' claim for constitutional violations. Perhaps he can argue that he did not hit (kick or punch) Mr. Payne before the jury, try to explain away his previous admissions in the criminal case, and argue his view of the videotape. But he certainly cannot show the lack of a dispute of material fact as to these issues.

Beyond the inclusion of the defense in his answer, Defendant Johns made no argument in support of a claim for qualified immunity. (*See* Dkt. 87 at 1.) Plaintiff, on the other hand, has discussed why Defendant Johns should *not* be entitled to this protection. (*See* Dkt. 167 at 19–22.) In an abundance of caution, the Court has considered the issue and determined Defendant Johns is not entitled to summary judgment on the basis of qualified immunity. *See Simmons v. Bradshaw*, 879 F.3d 1157, 1163 (11th Cir. 2018) ("Entitlement to qualified immunity is for the court to decide as a matter of law.").

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Lee*, 284 F.3d at 1197. At the same time, "the right [of police] to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Lee*, 284 F.3d at 1200 (quoting *Graham v. O'Connor*, 490 U.S. 386, 396 (1989)). So the question is how much force is too much, and the Fourth Amendment's "objective reasonableness" standard governs this analysis. *See Hadley*, 526 F.3d at 1329. The Eleventh Circuit has identified several factors that a court may use in determining whether

an officer's use of force was objectively reasonable, including "(1) the need for the application of force, (2) the relationship between the need and the amount of force used, (3) the extent of the injury inflicted, and (4) whether the force was applied in good faith or maliciously and sadistically." *See Hadley*, 526 F.3d at 1329 (quoting *Slicker v. Jackson*, 215 F.3d 1225, 1233 (11th Cir. 2000)).

In considering the totality of the circumstances, the force used must be reasonably proportionate and objectively reasonable. *Lee*, 284 F.3d at 1198. At the same time, "the Supreme Court has reminded us that the officer's conduct 'must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *Terrell v. Smith* , 668 F.3d 1244, 1251 (11th Cir. 2012) (quoting *Graham,* 490 U.S. at 396). Police are given this protection because they "are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

Viewing the facts in the light most favorable to Payne as it must in considering qualified immunity, the Court finds that a reasonable jury could find that Payne was not resisting arrest when Defendant Johns

30

applied significant and excessive force.  Under Plaintiff's version of the facts, he was lying face down on the ground, having immediately exited the stolen vehicle and given himself up to the police.  As soon as Defendant Johns reached Payne, he kicked him in the head.  He did not bend down or try to restrain the boy — he simply kicked him in the head. Defendant Johns took a brief moment to regain his balance and then stomped viciously on the back of Payne's head.  The facts certainly would allow a jury to conclude the boy was not struggling, resisting, or trying to get away.  It could find that, regardless of the high-speed chase, Payne had given himself up when the officer used significant force against him.[6] As Payne was neither resisting arrest nor posed a danger, Defendant Johns was likely not entitled to use any force at that time.  *Hadley*, 526 F.3d at 1329 (finding officer "was not entitled to use any force" against suspect who neither resisted arrest nor threatened officer).  But even if he could have used some force, a jury could find excessive Defendant

---

[6] Defendant Johns delivered more blows as he tried to handcuff Payne's hands behind his back.  He argues about whether the boy resisted those efforts.  It appears not.  But that is irrelevant as Defendant Johns had already delivered two vicious blows when Payne was totally compliant and defenseless.  Perhaps the additional beating is relevant to damages and other issues.

Johns's actions in kicking Plaintiff in the head and then stomping on him while he laid on the ground.  The evidence viewed in the light most favorable to Payne also shows that he received significant injuries.  (Dkt. 162 at 1.)  An ambulance took Payne from the scene of the crash to Grady Hospital and medical personnel there treated him for lacerations on his face and a concussion.

Defendant Johns says the video is ambiguous because the impact of his kick to Payne is "obscured" by another officer.  (Dkt. 162 at 4.)  But that is not entirely correct.  The video clearly shows Payne laying compliant on the ground as Defendant Johns runs up and kicks in the direction of his head.  Payne's head immediately snaps back.  While the actual moment of impact may not be visible, the video is susceptible to Plaintiffs' interpretation — the man kicked the boy in the head. Defendant Johns also describes his subsequent stomping on Payne's head as him "push[ing] the boy's head down with his foot."  But, again, the evidence is open to Plaintiffs' interpretation: Johns violently stomped on his head.  And, of course, Defendant Johns later admitted kicking Payne and stomping on him when he entered a guilty plea to those criminal charges.

The record also contains some evidence to suggest Defendant Johns did not apply the force in good faith. He was previously instructed to refrain from participating in the car chase. He disobeyed that direct order. There is at least a dispute of fact here about whether Defendant Johns applied the force maliciously or sadistically.

For all of these reasons, the Court holds that the facts (considered in the light most favorable to Payne) establish that Defendant Johns violated Payne's constitutional rights by using force that was plainly excessive, disproportionate to the circumstance, and objectively unreasonable.

The Court likewise finds that, at the time of the incident, Defendant Johns's conduct violated clearly established law. A party may show a particular amount of force violated clearly established law by pointing to a "materially similar case that has already decided that what the police officer was doing was unlawful." *Lee*, 284 F.3d at 1198. Because identifying factually similar cases may be difficult, a "narrow exception" also allows a party to show "that the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official,

notwithstanding the lack of case law." *Id.* Under this test, the law is clearly established, and qualified immunity can be overcome, only if the standards set forth in *Graham* and Eleventh Circuit case law "inevitably lead every reasonable officer in [the defendant's] position to conclude the force was unlawful." *Id.* (quoting *Post v. City of Fort Lauderdale,* 7 F.3d 1552, 1559 (11th Cir.1993)).

Plaintiffs have pointed to the Eleventh Circuit's "body of cases holding 'that gratuitous use of force when a criminal suspect is not resisting arrest constitutes excess force.' " *Sebastian v. Ortiz*, 918 F.3d 1301, 1308 (11th Cir. 2019) (citing *Hadley*, 526 F.2d at 1330). So for instance, in *Smith v. Mattox*, 127 F.3d 1416 (11th Cir. 1997), a suspect raised a baseball bat in a threatening position toward the officer and then fled.[7] The suspect then "docilely submitted to arrest" when an officer ordered him to "get down." *Id.* at 1417. The officer, however, "with a grunt and a blow," broke the suspect's arm while placing him in handcuffs. *Id.* The Eleventh Circuit held that officer was not entitled to qualified immunity because the "broken arm was obviously unnecessary

---

[7] The case here is even clearer than in *Smith*, as Payne did not threaten officers with a dangerous object like a baseball bat or attempt to flee the scene. He also did not resist arrest or struggle against Defendant Johns.

to restrain [the suspect] when he was offering no resistance at all." *Id.* at 1420.

The Eleventh Circuit has more recently clarified that "*Smith* established that if an arrestee demonstrates compliance, but the officer nonetheless inflicts gratuitous and substantial injury using ordinary arrest tactics, then the officer may have used excessive force." *Sebastian*, 918 F.3 at 1311. The Court finds that principle applicable here. *See also Hadley*, 526 F.3d at 1330 (holding punch to suspect's stomach excessive when he was not resisting arrest); *Lee*, 284 F.3d at 1200 (finding force excessive when arresting officer pulled non-resisting subject out of her car and slammed her head against the trunk of the car); *Slicker*, 215 F.3d at 1233 (holding force excessive where officers kicked handcuffed and non-resisting suspect in the ribs and beat his head on the ground).

Although qualified immunity is typically a broad shield for law enforcement officers, the Court holds that this case remains an outlier where Defendant Johns's conduct brought him "so far beyond the hazy border between excessive and acceptable force that [he] had to know he was violating the Constitution even without caselaw on point." *Priester v. City of Riviera Beach*, 208 F.3d 919, 926 (11th Cir. 2000) (internal

citations omitted).  Kicking and stomping on Payne as he lay on the ground compliant and having given himself up was by any measure unnecessary and gratuitous.  For purposes of the qualified immunity analysis, no reasonable police officer could have believed that doing so was lawful under the circumstances, particularly not with *Smith*'s principle that gratuitous force used on a subdued suspect crosses the line into excessive.  The Court holds Defendant Johns not entitled to qualified immunity.

In a less-than-conventional move, Plaintiffs not only oppose Defendant Johns's motion for summary judgment but also simultaneously seek summary judgment for themselves on their claim that he "violated Plaintiff Payne's clearly established Fourth Amendment rights to be free from an unreasonable seizure." (Dkt. 133-2 at 23.)  A reasonable jury could certainly conclude Defendant Johns's actions represented the unconstitutional use of excessive force.  That said, the affirmative defense of qualified immunity "is conceptually distinct from the merits of the plaintiff's claim that his rights have been violated." *Simmons*, 879 F.3d at 1162–63.

As explained above, in assessing qualified immunity, the Court construes the facts in the light most favorable to Plaintiffs and considers whether a reasonable jury could conclude Defendant Johns violated his constitutional rights.  Having denied qualified immunity, the Court must now allow that same "reasonable jury" to consider whether the force Defendant Johns applied was, in fact, excessive.  If the evidence at the summary judgment stage, viewed in the light most favorable to Plaintiffs as the nonmovants, shows there are facts that are inconsistent with qualified immunity being granted, the case and the qualified immunity issue along with it will proceed to trial.  *Id.* at 1163.  That is because "[i]f the official's motion [for qualified immunity] does not succeed . . . then his qualified immunity defense remains intact and proceeds to trial.  The facts as viewed for summary judgment purposes are no longer binding and the jury proceeds to find the relevant facts bearing on qualified immunity." *Id.*

Defendant Johns says he did not initially kick Payne and his actions after (including what the Court has referred to as "stomping" on him) were in reacting to Payne's actions in resisting arrest.  While the Court has found Defendant Johns not entitled to qualified immunity, he

is still entitled to present the disputed factual issues to a jury.  The Court denies Plaintiffs' motion for summary judgment as to Defendant Johns. (Dkt. 133.)[8]

### 2.   Summary Judgment Motions as to Defendant City of Atlanta  (Dkts. 141; 148)

The parties have also cross-moved for summary judgment on Plaintiffs' claims against the City. (Dkts. 141; 148.)  There is a good deal of overlap in the briefing of the two motions, so the Court addresses them jointly.

The City argues Plaintiffs cannot establish municipal liability under § 1983 because it was not the "moving force" behind Payne's injuries. (Dkt. 141 at 12–13.)  It also argues it had a constitutionally compliant policy in place to require only justified and reasonable use of force by APD officers.  In response, Plaintiffs argue that its claims against the City "are based on allegations that for many years, officers of the City of Atlanta Police Department, . . . including Defendant Matthew Johns . . . , have acted pursuant to APD customs and practices in a

---

[8] The Court finds that discussions through mediation may help the parties here.  Before setting a trial, the Court will order the parties to attempt to settle through mediation any remaining issues.  The specifics of the mediation order appear below.

manner that violates the constitutional rights of citizens." (Dkt. 151 at 2.) They also claim the City failed to adequately train, supervise, discipline, and screen officers for hiring. They contend that as a result, this municipal inaction and deliberate indifference on the part of the City are the "driving force" behind the violation of Payne's constitutional rights. (*Id.*)

A municipality may be found liable under 42 U.S.C. § 1983 only where the municipality itself causes the constitutional violation at issue. *Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658 (1978). Simple respondeat superior or vicarious liability will not attach under § 1983. *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989). "It is only when the execution of the government's policy or custom . . . inflicts the injury that the municipality may be held liable under § 1983." *Id.* (internal citations omitted). Said differently, the municipal policy or custom must be "the moving force behind the constitutional violation." *Gold v. City of Miami*, 151 F.3d 1346, 1350 (11th Cir. 1998).

And under a failure to train theory, "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with

whom the police come into contact." *City of Canton*, 489 U.S. at 388. To meet this demanding threshold, a "plaintiff must show that the municipal action was taken with the requisite degree of culpability, i.e., that the municipal action was taken with deliberate indifference to its known or obvious consequences." *Davis v. DeKalb Cty. Sch. Dist.*, 233 F.3d 1367, 1375 (11th Cir. 2000).

Plaintiffs' theory of municipal liability is just that — a theory. The record contains no evidence or "specific facts" to support their sweeping claim. The record perhaps contains evidence to support a finding of some level negligence on the part of the City. But "[a] showing of simple or even heightened negligence will not suffice" to impose municipal liability under § 1983. *Bd. of Cty. Com'rs v. Brown*, 520 U.S. 397, 407 (1997).

Plaintiffs can point to nothing to show a policy, practice, or custom that directly caused Payne's injuries. Nor can they point to any evidence suggesting deliberate indifference on the part of the City to trigger municipal liability. Should Defendant Johns have been flagged through the Early Warning System based on his use of force incidents? Yes, it is undisputed that his disciplinary history met the criteria. But he was never flagged and APD was never alerted to his status. Any claim of

deliberate indifference requires a showing that the City deliberately or consciously ignored a known or obvious consequence. *See id.* ("[The municipality's] continued adherence to an approach that they know or should know has failed to prevent tortious conduct by employees may establish the conscious disregard for the consequences of their action — the 'deliberate indifference' — necessary to trigger municipal liability."). But the record contains nothing to suggest it did.

Should APD have more meticulously vetted Defendant Johns's military history and psychological background before hiring him? Probably. And with the benefit of hindsight, the answer is, of course, yes. As the Supreme Court has recognized, however, "[i]n virtually every instance where a person has had his or her constitutional rights violated by a city employee, a § 1983 plaintiff will be able to point to something the city 'could have done' to prevent the unfortunate incident." *City of Canton*, 489 U.S. at 392 (quoting *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985)). But that is simply insufficient to impose liability on a municipality.

Plaintiffs' brief in opposition to the City's motion for summary judgment spends a lot of space discussing the structural organization of

41

APD and the Police Chief's role in the hiring and firing of officers. (Dkt. 151 at 5–7.) All of that is immaterial when the record contains no evidence of an unconstitutional policy, custom, or practice, either formal or informal. The record also is devoid of any evidence showing the City failed to train Defendant Johns on the use of force or that the City deliberately chose not to provide the training. Even if that were the case though, Plaintiffs cannot establish the causal connection between Payne's injuries and a lack of training. The Supreme Court has cautioned that it will not "suffice to prove that an injury or accident could have been avoided if an officer had had better or more training, sufficient to equip him to avoid the particular injury-causing conduct. Such a claim could be made about almost any encounter resulting in injury. . . ." *City of Canton*, 489 U.S. at 391.

Plaintiffs allege in their complaint that the City of Atlanta had a "persistent and widespread practice" of authorizing APD officers "to cover up the use of excessive force." (Dkt. 151 at 3 (citing Dkt. 1 ¶ 32).) Yet the evidence simply does not bear out that conclusory accusation of a coverup. Defendant Johns's expert Dr. Gaut testified there were about forty use of force incidents where the officers used compliance strikes on

42

the subject to arrest them.  But the Court agrees with the City that all of these situations diverge on one critical point: "the subjects were resisting, and the officers used force to gain control, unlike the present situation where Mr. Payne was not resisting Officer Johns."  (Dkt. 153 at 13 n.50.)

Defendant Johns's actions are more like a "random act[ ] or isolated incident[ ]" than a pattern or practice.  *McDowell v. Brown*, 392 F.3d 1283, 1290 (11th Cir. 2004).  And the Eleventh Circuit has made clear that isolated incidents are insufficient to impose liability on a municipality.  *Id.*  The Court agrees with the City that it "cannot be found deliberately indifferent to Plaintiff Payne's rights because Officer Johns made the conscious choice to [disregard a direct order and] engage in the actions that caused Payne's injuries."  (Dkt. 153 at 16.)

Plaintiffs also point to instances in which APD allegedly condoned or approved of their officers' use of force against suspects.  These include "striking suspects with closed fists; kicking a suspect in the midsection; striking a suspect in the head with a closed fist three times; and kicking a suspect using a leg sweep method."  (Dkt. 151 at 15.)  What Plaintiffs overlook, however, is that in each of those instances, the APD officers deployed those tactics on *resisting suspects*.  Beyond this instance with

43

Defendant Johns, Plaintiffs failed to identify a single Use of Force report where "compliance strikes" were used against a suspect who was not resisting arrest. (Dkt. 153-1 ¶ 77.) No one disputes — and the Supreme Court has definitively stated — "the right [of police] to make an arrest necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Lee*, 284 F.3d at 1200 (quoting *Graham*, 490 U.S. at 396). There is thus no pattern of unconstitutional action condoned by the City.

Plaintiffs have also failed to put forth evidence of a situation in which an APD officer used excessive force against an individual, APD determined the use of force violated policy, and APD failed to take disciplinary action against the officer. Plaintiffs' claims that APD condones and ratifies officers' use of excessive force thus must fail.

The Court grants Defendant City of Atlanta's motion for summary judgment and denies Plaintiffs' motion for partial summary judgment against the City.[9] Because the Court grants judgment for the City,

---

[9] The City seeks dismissal of Count I of Plaintiffs' complaint, which alleges violations of Payne's Fifth and Fourteenth Amendment rights. (Dkt. 141 at 12 n.67.) Plaintiffs acknowledge that the inclusion of the Fifth Amendment was a typographical error. (Dkt. 151 at 3–4.) The

Plaintiffs' claim for fees under 42 U.S.C. § 1988 as to the City also fails. The Court terminates Defendant City of Atlanta as a party defendant.

## IV.  Conclusion

For these reasons, the Court **DENIES** Defendant Matthew Johns's Motion to Strike the Opinions of Sergeant Scott DeFoe (Dkt. 166) and **DENIES** his Motion to Strike Opinions in Plaintiff Payne's Medical Records (Dkt. 170).

The Court **DENIES** Defendant Matthew Johns's Motion for Summary Judgment (Dkt. 162) and **DENIES** Plaintiffs' Motion for Partial Summary Judgment Against Matthew Jones (Dkt. 133).

The Court **GRANTS** Defendant City of Atlanta's Motion for Summary Judgment (Dkt. 141) and **DENIES** Plaintiffs' Motion for Summary Judgment as to Defendant City of Atlanta (Dkt. 148).  The Court **DIRECTS** the Clerk to terminate Defendant City of Atlanta as a party defendant.

The Court **ORDERS** the rest of this case to mediation.  The parties may retain the mediator to mediate this case.  The expense of a retained

---

Court thus dismisses any allegations asserted under the Fifth Amendment.

mediator must be paid by the parties. The parties, alternately, may request that the Court appoint a magistrate judge to conduct the mediation. The parties are not required to pay for mediation by a magistrate judge.

The parties shall advise the Court, on or before October 13, 2020, of their mediation preference. If they elect to retain their own mediator, the parties shall identify the mediator on or before October 27, 2020. The parties must have present at the mediation a person with authority to settle this litigation.

The parties shall, within five days after the mediation, notify the Court in writing whether mediation resulted in a settlement of this action.

The Court **STAYS** this case pending mediation. The Court **DIRECTS** the Clerk to **ADMINISTRATIVELY CLOSE** this case during the period of the stay.

**SO ORDERED** this 21st day of September, 2020.

_____
MICHAEL L. BROWN
UNITED STATES DISTRICT JUDGE